[No. 26776.   Department Two.   January 5, 1938.]

C. M. SUTTON *et al., Respondents,* v. C. H. PETERSON *et al., Appellants.*[1]

[1]Reported in 74 P. (2d) 884.

*Eggerman & Rosling,* for appellants.

*Henry S. Noon,* for respondents.

GERAGHTY, J.—This action was brought by the plaintiffs to rescind a contract for the purchase of a quantity of standing timber and for damages.

The trial court found that the purchase was induced by false and fraudulent representations made by the defendants. Judgment was entered rescinding the contract and awarding the plaintiffs a money judgment for payment made on account of the purchase price, as well as for certain incidental expenses incurred by them. The defendants appeal.

The husbands will be referred to singly as respondent and appellant.

In March, 1936, the respondent's attention was attracted to an advertisement offering for sale the timber on an eighty-acre tract of land in Jefferson county, described as the south half of the northwest quarter of section 29, township 28 north, range 1, E. W. M. The advertisement was inserted by Clayton Aldridge, a timber broker, who had not seen the land, did not know the owner, and, admittedly, did not represent him.

The respondent called upon Aldridge two or three times in reference to the timber. At his first interview, Aldridge gave him an accurate description of the land and a memorandum indicating that there was two million ninety-five thousand feet of timber on the tract. He had gotten this information from a cruise made by Jefferson county in 1922-1923. The appellant was a cripple, and had not himself ever seen the timber.

Aldridge testified that he showed the respondent a letter he had received from the county giving the quantity of timber as shown upon a county cruise, but that the report contained a notation that there had been a

controversy or litigation about the quantity of timber on the land.

The respondent testified that Aldridge gave him the figures on the timber, but did not exhibit any letter and made no reference to a controversy about the amount. The respondent also spoke about the timber to a Mr. Larsen, who knew about it. Respondent had not, however, obtained the name of the owner from Aldridge or Larsen. Having secured from Aldridge the description of the land, he made a trip to Jefferson county, accompanied by his brother-in-law, for a personal inspection of the timber, and spent a day in going over what they thought was the eighty-acre tract which had been described to him by Aldridge.

Satisfied with his inspection, on his return he again called on Aldridge and told him that he had made up his mind to buy the timber, and that he also planned to purchase a forty-acre tract owned by Jefferson county cornering the Peterson tract on the southeast. Having secured the name of the owner from the auditor of Jefferson county sometime after his first trip to the land, he called on the appellant, who lived on Vashon island, with the view of purchasing if terms could be arranged.

After some negotiations, a price of twenty-four hundred dollars was agreed on; seven hundred fifty dollars payable in cash; something less than four hundred dollars was to be paid by the assumption of unpaid taxes; and the balance of the purchase price, payable in three equal installments, to be evidenced by a promissory note.

After these terms were tentatively agreed on, the respondent, again accompanied by his brother-in-law, made a second trip to the land. On returning from this trip, he had his wife telephone to the appellant that he was ready to sign a contract and would meet him at his

attorney's office in Seattle. The parties met there, and the formal contract was executed May 2, 1936.

Respondent began immediate preparation for logging. He secured a donkey engine and other equipment and commenced to clear a rough road from Shine, on tide water, to the timber, a distance of about a mile and a half. He also contracted for the purchase of the county forty acres.

When these operations had been carried on for somewhat over a month, he asked the help of a cruiser of the McCormick Timber Company to locate the north line of appellant's land and then, for the first time, discovered that he had inspected the wrong tract. He had examined the north half of the northwest quarter of section 29, covered with virgin timber and owned by the McCormick company, instead of the south half—appellant's tract, the description of which had been given to him by Aldridge. The appellant's land had been logged over some twenty-five years before and, as the record seems to imply, contained between seven and eight hundred thousand feet of merchantable timber; whereas the timber on the McCormick eighty would approximate over two and one-half million feet.

On discovering his mistake, respondent made demand on the appellant for rescission of the contract, return of the money paid, and for the expenses he had incurred. On appellant's refusal, respondent instituted this action.

A contract may be rescinded for a mutual mistake of fact, or for fraudulent misrepresentations made by one of the parties. The respondent does not base his right to rescission on the existence of a mutual mistake, but on the ground of fraud. The court reached its conclusion that the appellant was chargeable with fraud on two principal considerations: First, that he had misled the respondent by exhibiting to him the county

cruise of 1923, which showed a much greater quantity of timber than was actually on the land; and, secondly, that he withheld information of a revised estimate made by the county in 1929, when the valuation of the timber was placed at a considerably lower figure.

A careful reading of the record convinces us that the appellant did not withhold from the respondent knowledge of the true quantity of timber; and, in the second place, that the respondent, as the result of his mistake in examining the wrong tract, with which he alone is chargeable, had made up his mind to purchase, and that this purpose was not influenced by any information given or withheld by the appellant. Respondent professed to have had experience in logging and locating boundaries in the woods and seemed to be impatient at the suggestion of the appellant that he examine the land carefully before purchasing. He was quite confident of his own ability. Testifying, he said:

"Q. Now, when you came back to see Mr. Aldridge you told him that you had been out and looked over this Peterson timber? A. Yes. Q. And, as a matter of fact, you told him that you had been out to check the timber twice, didn't you? A. I was out and checked the timber once. . . . Q. And when you finally called the last time upon Mr. Aldridge did you tell him that you had made up your mind that you wanted this timber? A. I told him that I had made up my mind that I wanted to buy this piece of timber that I had seen, yes. . . . Q. Now, after you had told Mr. Aldridge that you had made up your mind that you wanted this timber, you asked Mr. Aldridge who owned it? A. Yes. Q. And he told you that he didn't know? A. Yes. Q. Then did you not tell him that you were going out to try and find the owner and make a deal yourself? A. I told him that I was going to buy the timber if I could."

In relation to his first trip to the appellant's home, he testified:

"Q. Don't you recall Mrs. Peterson asking you that evening or that afternoon, rather, when you told her what you wanted to see Mr. Peterson about, whether you had seen the timber? A. Well, she asked me what I wanted to see Mr. Peterson about. Q. Yes. A. And I told her that he had a piece of timber in Jefferson County and that I would like to buy it. . . . Q. And she told you that neither she nor her husband had ever seen it, didn't she? A. Yes. Q. And she asked you whether or not there was not considerable nice timber on that 80. Do you remember that? A. Yes. Q. And you said 'Yes'? A. There was nice timber on that 80 that I looked at, yes. Q. Well, she didn't ask you anything about any 80 except the Peterson 80, did she? A. She asked me about the Peterson timber that I looked at, yes."

The respondent testified that, at their first meeting, appellant showed him the old county cruise, but did not inform him of the later reduction in valuation made by the county. The appellant testified that he told respondent a change had been made in the valuation and gave him tax statements showing the reduction. The taxes were several years in default and were covered by a contract the appellant had made with the county for payment in installments. The statements and contract were given to the respondent when the contract was executed. Touching his negotiations with the appellant, respondent testified:

"Q. Well, did you have any conversation in the presence of Mrs. Peterson at any time in which Mr. Peterson told you to be sure to locate the corners and be satisfied with the timber, and get your right of way? A. Before, in the presence of Mrs. Peterson? Q. Yes. A. No. Q. Did he tell you that in the absence of Mrs. Peterson? A. Yes. Q. He did? A. Yes. Q. Before you ever signed any contract? A Before I ever signed any contract? Q. Yes, when you were talking about the deal? A. Yes. Q. He told you to be sure that you were satisfied with the timber; to locate the corners and get the right of way. Now,

what did he mean by 'the right of way'? A. The right of way? Q. Yes. A. Well, across this here private land. Q. But you told Mr. Peterson that you were an old logger and knew more about the timber than he did, didn't you? . . . A. Well, I told him that I knew more about the woods probably than he did, yes."

The respondent had so exaggerated an idea of the value of what he thought he was buying, based on his inspection of the McCormick tract, that no representation on the part of the appellant could influence his determination. He testified that, if he had secured the McCormick eighty and the forty he thought he was purchasing from the county, he would have made a profit of thirty thousand dollars. It appears from the record that he made a mistake in locating the county tract as well as the appellant's:

"Q. Then $32,000 was what you figured would be your net profit on this 80 acres of timber that you were thinking that you were getting for $2400? A. I didn't say that there would be a profit of $40,000. Q. You said between thirty and forty thousand dollars? A. Yes, sir. . . . Q. In other words, you had made up your mind from the talks that you had with Mr. Aldridge and Mr. Larsen and the investigation that you made that you wanted this timber if you could buy it right, is that right? A. Yes. Q. And when you left Mr. Larsen and looked at the timber you would have been willing, if necessary, to have paid $2500, wouldn't you? You were that much sold on this timber that you would have paid $2500 if you had had to? A. If I had had to, I suppose I would have paid $2500. Q. . Yes. A. For the piece of timber that I looked at."

Again recounting his conversation with the appellant at their first meeting, he testified:

"Q. Now, when Mr. Peterson showed you this old county cruise that you have had identified as an exhibit did you say to Mr. Peterson, 'I don't care anything

about the cruise. I have seen the timber and I know more about it than you do'? A. No. Q. And you handed the cruise back to him? A. He asked me if that there cruise checked up with the timber that I had seen and I told him that it had. . . . Q. In other words, Mr. Peterson did not pretend to know what the timber conditions were on this 80, and he was asking you to investigate and locate the corners, and then when you said that you had, he asked you how it checked up with this old county cruise, didn't he? A. Mr. Peterson told me—he says, 'I have never been on this land but,' he says, 'I know that there is that much or better from what everybody has told me that was on there.' . . . Q. Well, didn't Mr. Peterson, when you came back, not ask you how your investigation of the timber compared with this old county cruise that he had? A. Yes. Q. And what did you say? A. That it did. . . . Q. Now, after the contract was signed did you ask Mr. Peterson for this paper—this old cruise? A. No."

That the appellant had no purpose to defraud the respondent is evidenced by the fact that he offered the timber at the price he had previously set upon it, notwithstanding the respondent's obvious keenness to purchase.

Mr. H. Bacus, who had had fifty years' experience in the timber business, a witness for the appellant, upon whose knowledge and fairness the trial court commented favorably, testified he had been over appellant's timber several times and that, in 1935, he had offered appellant $2,200 cash for this timber; and that it was a good buy at $2,400, the price agreed to be paid by respondent. He also testified that experienced timbermen do not attach much importance to county cruises and make their own examination. He stated that a practical logger would have no difficulty in locating the corners of appellant's timber. He had himself located them without any difficulty.

██ The principle controlling here is stated in *Stewart v. Larkin,* 74 Wash. 681, 134 Pac. 186, L. R. A. 1915B, 1069, where the court said:

"It has always been the law that where the parties deal as strangers and the means of knowledge are equally available and the lands subject to the inspection of the purchaser, and he avails himself of the opportunity of inspection afforded him, he cannot be heard to say that he has been deceived, even though the truth has been withheld from him or the facts misrepresented, as the true facts are as available to him and as much within his knowledge as that of the one with whom he deals. *West Seattle Land & Imp. Co. v. Herren,* 16 Wash. 665, 48 Pac. 341; *Griffith v. Strand,* 19 Wash. 686, 54 Pac. 613; *Walsh v. Bushell,* 26 Wash. 576, 67 Pac. 216; *Samson v. Beale,* 27 Wash. 557, 68 Pac. 180; *Zilke v. Woodley,* 36 Wash. 84, 78 Pac. 299; *Pigott v. Graham,* 48 Wash. 348, 93 Pac. 435, 14 L. R. A. (N. S.) 1176; *Aurora Land Co. v. Keevan,* 67 Wash. 305, 121 Pac. 469; *Conta v. Corgiat, ante,* p. 28, 132 Pac. 746."

In *Biel v. Tolsma,* 94 Wash. 104, 161 Pac. 1047, it is said:

"We have never held, and indeed no reputable court has held, that in dealing for property, real or personal, when the property was at hand and the means of ascertaining its condition, its correspondence with the representations made concerning it by the seller, and its value, reasonably ascertainable, that a buyer could shut his eyes thereto, and blindly and recklessly rely upon any and all opinions or representations made concerning it by the seller. To establish such a rule would be to place a premium upon carelessness and indifference."

██ In their answer, the appellants, by way of cross-complaint, prayed for judgment on the promissory note given by respondents for the unpaid balance of the purchase price. At the opening of the trial, by agreement of the parties, the answer was considered

amended so that, in the event of a finding for the appellants, the court might forfeit the contract, in accordance with its terms; the note given by the respondents for the remainder of the purchase price to be cancelled and returned to them.

The judgment of the trial court is reversed, and the cause remanded with direction for the entry of judgment for the appellants in accordance with the prayer of their answer as amended.

STEINERT, C. J., BEALS, MILLARD, and ROBINSON, JJ., concur.

